**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**PADUCAH DIVISION**
**CASE NO. 5:10-CV-00074-R**

**DONNIE MCKINNEY and**
**MARCIA MCKINNEY**                                        **PLAINTIFFS**

**v.**

**BRIAN LAIRD and**
**CITY OF PADUCAH**                                        **DEFENDANTS**

**MEMORANDUM OPINION**

This matter is before the Court on Defendants' motion for summary judgment (DN 39). Plaintiffs have responded (DN 53) and Defendants have replied (DN 58). Plaintiffs have further moved for the Court to hold a hearing on this motion where the parties can present their sides orally. (DN 60). After review of the record, the Court believes that this hearing is unnecessary. For the reasons detailed below, Defendants' motion is GRANTED.

**I. BACKGROUND**

The current action arises out of a tactical assault on Plaintiffs' residence on November 19, 2009, by the Paducah Police Department's Special Weapons and Tactics ("SWAT") team. Plaintiffs filed suit against the City of Paducah and others, insisting the show of force was objectively unreasonable under the Fourth Amendment. While the presence of the SWAT team ultimately proved unnecessary, its use was not unwarranted. For that reason, summary judgment is proper.

**A. General background on the murders and Plaintiffs' residence**

On October 28, 2009, unknown intruders broke into the home of Mary and Lynn Moore in Hopkins County, Kentucky. There, they murdered the couple and burglarized the house, making off with several firearms, including two AK-47 assault rifles. Law enforcement officials

1

from Hopkins County discovered the Moores' bodies two days later and initiated their investigation.

Dustin McKinney ("Dustin") is the adopted son of Plaintiffs Donnie and Marcia McKinney ("Donnie" or "Marcia" or collectively "Plaintiffs").  Plaintiffs reside at 2260 Olivet Church Road ("Olivet Road House" or "House") in Paducah, Kentucky.  There is disagreement among the parties on the frequency with which Dustin stayed at the Olivet Road House.  However, Plaintiffs agree Dustin lived there with his girlfriend and child for a two-week span in October of 2009 and he had spent the night with his parents three or four days before November 19, 2009.  Sometime during this time period, Donnie told Dustin not to return to the Olivet Road House because of his continuing drug use.[1]  Still, his parents admit Dustin came and went from the House with regularity and that it was his legal residence.

**B. Events between November 9, 2009 and 11:00 p.m. on November 19, 2009**

On or around November 9, 2009, Detective Brian Laird was contacted by someone from the Hopkins County Sherriff Department ("HCSD"), inquiring if the Paducah Police Department ("PPD") could look in the pawn database system for the serial numbers of the firearms taken from the Moores' residence.  Laird checked the system but was unable to locate information on the weapons.

At 5:00 p.m. on November 19, 2009, Detective Sanderson of the HCSD contacted Laird, requesting assistance in locating a murder suspect.  Sanderson knew the suspect's name was "Dustin" and knew that he was a white male, approximately 6'1", with short dark hair.  The HCSD also knew the suspect was driving a red Dodge truck at the time of the murders.  Finally, Sanderson relayed that the suspect used a cell phone with the number (270) 933-8185 and that

---

[1] The parties dispute when this conversation between Donnie and Dustin occurred.  Considering the members of the Paducah Police Department could not have known the inner workings of the McKinney family prior to executing the search warrant, the date of the discussion is irrelevant.

the phone was registered through AT&T to Vickie Reynolds, who resided at 3179 Jackson Street in Paducah.  Authorities from the HCSD did not know the suspect's surname.

Laird recognized Reynolds's address because two PPD detectives, Detective Hayes and Detective Copeland, had visited the residence the day before on an unrelated matter.  Hayes and Copeland told Laird that during their visit, they had seen a pickup truck matching the description of the vehicle provided by Sanderson.  They had also spoken with a young man, answering to the name of "Dustin," that matched the suspect's description.

The PPD began to search in earnest for information on the suspect.  Laird dispatched the two detectives back to Jackson Street and Reynolds informed them that the man they had spoken with yesterday was Dustin McKinney, but said that she did not know where he lived or his whereabouts.  She also said that the phone number provided by the HCSD matched that of a cell phone she had given Dustin.  Back at PPD headquarters, Laird conscripted Detective Robert Estes to contact his sister Teresa Shoulta, and Dustin's ex-girlfriend, to ask her if she knew where he was.  Shoulta stated she had spoken with Dustin that day, and while she did not know his exact whereabouts, the last place she knew Dustin was staying was with his parents on Olivet Church Road.  Estes passed along this information to Laird.

With Reynolds's disclosures, Laird searched for Dustin's name in the criminal history, driver's license, and vehicle registration databases.  Dustin had a lengthy arrest record with the PPD.  Following each arrest, he had listed his address as the Olivet Road House.  The same address appeared on his driver's license and vehicle's registration.  Sanderson and Laird then coordinated to secure both an arrest warrant for Dustin and a search warrant for the Olivet Road House.

At 9:30 p.m., Sanderson obtained the arrest warrant for Dustin for two counts of murder and one count of first-degree robbery.  He also told Laird the types of weapons missing from the Moores' residence and their serial numbers so that they could be added to the application for the search warrant.  After the arrest warrant was entered into a state-wide computerized database, Laird began to prepare the search warrant for the Olivet Road House.  At 10:57 p.m., a state court judge in McCracken County signed off on the search warrant.  It listed the various weapons stolen from the Moore's residence, including the two assault rifles.

While waiting on the completion and approval for the search warrant, Laird contacted his supervisor Captain Barnhill to bring him up to speed.  Barnhill is also the leader of the SWAT team.  The two men conferred about the situation and Barnhill decided the search justified the use of the SWAT team.  Barnhill contacted Assistant Chief of Police Grimes and requested the team's deployment because Dustin was suspected of murder and possessing high-powered weaponry.  Grimes approved the use of the SWAT team and spoke with his superiors in the PPD about the decision. [2]

Sometime after 10:00 p.m., thirteen members of the SWAT team, eleven operators and two snipers, assembled at PPD headquarters and were briefed on the warrant and the possibility that Dustin was armed.[3]  The team left headquarters and parked on a side street near Olivet Church Road.  Sharpshooters arrived in advance of the main team and scouted the House.  They were able to see movement within but were unable to tell whether Dustin was inside.

## C. Events from 11:00 p.m. until Plaintiffs are subdued

[2] Laird, Barnhill, and Grimes appear to have followed the PPD's procedure for activating the SWAT team. According to the PPD's policies and procedures, only the on-duty shift commander can request the use of the SWAT team.  Such a request is made to either the chief of police or the assistant chief of patrol.  These individuals then confer and decide whether the team is necessary.

[3] Members of the SWAT team are divided into two groups: operators and snipers.  Operators enter the residence and secure it from within while snipers secure and maintain a perimeter around the premises.

Following a brief meeting on a side street, members of the SWAT team approached the Olivet Road House, where they paused 10 to 15 yards away. Several team members went to the front door while several more approached from the rear. Barnhill took up a position to the side of the House with a clear view of the living room and front door. From his vantage point, he could see Donnie on the couch watching television in the living room, which is connected to the foyer and near the front door. He recognized that Donnie was not the murder suspect but did not inform the rest of the team of his identity. With his peripheral vision, Barnhill watched the SWAT operators approach the front door, knock loudly, and yell "Police Department."

From here, the parties' stories are garbled – understandably so considering the swift and disorienting series of events that followed. Barnhill saw Donnie get up from the couch two or three seconds after the knock and start moving towards the door. He lost sight of Donnie as he left the living room and entered the foyer. Barnhill then instructed the operators at the front door to "bang out," which means that when, and if, flashbang grenades are detonated, they are done so outside the residence. Flashbang grenades are diversionary devices that create an extremely loud noise and a bright flash of light. Throwing flashbang grenades outside blunts their effect on the occupants and lessens the possibility of injury.

Outside the front door, SWAT operators saw movement coming towards the door, prompting them to knock again and identify themselves. They claim that the unidentified individual paused just short of the door, but admit their view was obstructed because the adjacent windows did not provide a clear line of sight. Worried that the individual was readying a weapon, the operators threw a flashbang grenade in the lawn near the front door. After it detonated, they breached the door with a battering ram. SWAT members claim they waited 15 to 20 seconds between their first knock and breaking down the door.

Inside the house, Donnie was watching television in the living room while Marcia was in the kitchen speaking on the phone with Shoulta.  According to Marcia, she saw members of the SWAT team in the back yard through the kitchen window.  She then called to Donnie from the kitchen to go and open the door, and ended her conversation with Shoulta.  Donnie claims it was his wife's voice, not the commotion by the police, which prompted him to go to the door.  He says he did not hear the members of the SWAT team knock or announce their presence.  In any event, Donnie says he walked to the foyer from the living room and unlocked the bolt to the door.  As he leaned to peer out the side window and see who was there, the door "blew open" and knocked him against a set of French doors located in the foyer.

Officer Robbins was first through the front door for the SWAT team, with several team members lined up behind him ready to enter, fan out, and secure the house.  Upon entry, Robbins encountered Donnie in the foyer.  Robbins ordered Donnie to go to the ground at least four times, but claims Donnie did not comply and instead mouthed off to him.  Robbins further stresses that Donnie's position in the foyer prevented the rest of the SWAT team from entering the house, effectively creating a bottleneck at the front door.  To bring Donnie to the ground, Robbins applied a "sternum tap," which is a pain compliance technique where an officer strikes a subject with the barrel of their weapon in the sternum to bring the individual to the ground.  According to Robbins and Barnhill, since members of the SWAT team are trained to keep both hands on their rifles at all times, they must administer the sternum tap with the barrel of the gun.  Robbins says the safety to his weapon was on when he performed the maneuver.

For his part, Donnie declares that he was temporarily stunned by the blast and the door being broken down.  Before he could react or determine who the men were, Donnie said "there were three guys hitting him with hard objects."  He insists the commotion prevented him from

6

hearing Robbins's orders to "Get on the floor."  Once Donnie could understand the police officers, he went prone on the floor.  A SWAT officer placed his foot on Donnie's shoulder, but he moved it when Donnie complained he was short of breath.  Donnie was held in this position while the SWAT operators moved to secure the House.  Barnhill decided against handcuffing Donnie during the search.

In the kitchen, Marcia observed Donnie put his hands up in the air as two or three SWAT operators quickly surrounded him.  From her position, she did not perceive that the operators were having any difficulty getting by Donnie and into the House.  Next, she saw two men proceeding towards her in the kitchen, yelling at her to "Get down."  Although the SWAT operators began pushing her to the ground when they reached the kitchen, they stopped when she complained about her hip and helped her to the floor.  A SWAT operator held a gun on her while the rest of the team secured the House.  Barnhill ordered his men not to handcuff Marcia as well.

## D. Execution of the search warrant and capture of Dustin

When the House was secure, Donnie and Marcia were moved to the dining room and permitted to sit at the dining room table.  After waiting for the all clear from the SWAT team, Laird entered the House and proceeded to the dining room, where he introduced himself and told the Plaintiffs he had a search warrant.  Laird read the warrant and then began, along with other detectives from the PPD, the ultimately fruitless search of the House and outbuildings for Dustin and the weapons.  Afterward, Laird explained the PPD's rationale for the search, but ended the conversation when Plaintiffs became agitated.  The entire incident, from the SWAT team's arrival on the side road to Laird leaving the Olivet Road House took approximately one hour and five minutes.  Donnie was treated at a hospital for two broken ribs later that night, presumably the result of Robbins's sternum tap.

Later that evening, HCSD triangulated the position of Dustin's cell phone and traced it back to a trailer park in Graves County, Kentucky.  The Kentucky State Police surrounded a group of three trailers and waited for morning when they used a loudspeaker to inform Dustin that he was surrounded.  Dustin surrendered without incident.

**E. Procedural history**

On April 20, 2010, Plaintiffs filed suit against Laird in his official and individual capacity, the City of Paducah ("City"), and John Does 1-20, representing the unknown officers of the SWAT team.  Collectively, they advanced a variety of federal law causes of action, including violations of the Fourth Amendment, violations of the substantive and procedural Due Process Clause under the Fifth and Fourteenth Amendments, and conspiracy to violate their constitutional rights.  All of these claims are pursued under 42 U.S.C. §§ 1983 and 1985.  In addition, Plaintiffs made claims under the state-law theories of assault, battery, negligence, and gross negligence.[4]

On January 3, 2011, the Plaintiffs filed their first amended complaint, substituting the John Does for seventeen members of the SWAT team that participated in the raid on the Olivet Road House.  Defendants moved to strike the amended complaint because the statute of limitations prohibited suit against these defendants and Federal Rule of Civil Procedure 15(c) did not permit relation back to the original complaint's filing.  Memo. & Op. Ord., DN 29.  The Court struck the members of the SWAT team as defendants, but permitted the lawsuit to continue against the City and Laird.  This motion for summary judgment has followed.

In Plaintiffs' response to this motion, they agree to dismissal of the claims against Laird in his individual capacity.  Such a concession leaves the City as the only defendant before the

---

[4] In their response, Plaintiffs abandon their claims under the Third Amendment for quartering soldiers and intentional infliction of emotional distress.  Pl. Response, DN 53 p. 17, 34.

Court.  *See Stephens v. Hayes*, 374 F. App'x 620, 623 (6th Cir. 2010); *Matthews v. Jones,* 35 F.3d 1046, 1049 (6th Cir. 1994).

## II. STANDARD

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact."  *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989).  The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case.  *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996).  The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff.  *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  Mere speculation will not suffice to defeat a motion for summary judgment: "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment.  A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate."  *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

## III. DISCUSSION

## A. Municipal Liability under § 1983

When a § 1983 claim is made against a municipality, a court must analyze two distinct issues: (1) whether the plaintiff's harm was caused by a constitutional violation; and (2) if so, whether the municipality is responsible for that violation. *Collins v. City of Harker Heights, Tex.,* 503 U.S. 115, 120 (1992).

"[A] municipality cannot be held liable *solely* because it employs a tortfeasor - or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 691 (1978) (emphasis in original); *Searcy v. City of Dayton,* 38 F.3d 282, 286 (6th Cir. 1994); *Berry v. City of Detroit,* 25 F.3d 1342, 1345 (6th Cir. 1994). "[T]he touchstone of 'official policy' is designed 'to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible.'" *City of St. Louis v. Praprotnik,* 485 U.S. 112, 138 (1988) (quoting *Pembaur v. Cincinnati,* 475 U.S. 469, 479-80 (1986)) (emphasis in *Pembaur* ). Put another way, to succeed against a municipality under § 1983, the plaintiff must "(1) identify the municipal policy or custom, (2) connect the policy to the municipality, and (3) show that his particular injury was incurred due to execution of that policy." *Alkire v. Irving*, 330 F.3d 802, 815 (6th Cir. 2003) (citing *Garner v. Memphis Police Dep't,* 8 F.3d 358, 364 (6th Cir. 1993)).

A municipality cannot be held responsible for a constitutional deprivation unless there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation. *Monell,* 436 U.S. at 691; *Deaton v. Montgomery Cnty., Ohio,* 989 F.2d 885, 889 (6th Cir. 1993). The plaintiff must "identify the policy, connect the policy to the city itself and show that the particular injury was incurred because of the execution of that policy." *Garner v. Memphis Police Dep't,* 8 F.3d 358, 364 (6th Cir. 1993) (quoting *Coogan v. City of Wixom,* 820

F.2d 170, 176 (6th Cir. 1987) overruled on other grounds, *Frantz v. Village of Bradford,* 245

F.3d 869 (6th Cir. 2001)).  The policy or custom "must be 'the moving force of the constitutional

violation' in order to establish the liability of a government body under § 1983." *Searcy,* 38 F.3d

at 286 (quoting *Polk Cnty. v. Dodson,* 454 U.S. 312, 326 (1981) (citation omitted)); *Bd. of Cnty.*

*Comm'rs of Bryan Cnty., Okla. v. Brown,* 520 U.S. 397, 404 (1997) (indicating that plaintiff must

demonstrate "deliberate conduct").

**B. Fourth Amendment Violations alleged by Plaintiffs**

The first part of liability under § 1983 requires a showing of a constitutional deprivation

by the municipality.  The Fourth Amendment, made applicable to the states by the Fourteenth

Amendment, provides that "[t]he right of the people to be secure in their persons, houses, papers,

and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const.

amend. IV.

"Determining whether the force used to effect a particular seizure is reasonable under the

Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the

individual's Fourth Amendment interests against the countervailing governmental interests at

stake." *Graham v. Connor*, 490 U.S. 386, 395-96 (1989) (internal citations and quotations

omitted).  "[T]he test of reasonableness under the Fourth Amendment is not capable of precise

definition or mechanical application, however, its proper application requires careful attention to

the facts and circumstances of each particular case, including the severity of the crime at issue,

whether the suspect poses an immediate threat to the safety of the officers or others, and whether

he is actively resisting arrest or attempting to evade arrest by flight." *Id*. at 396 (internal

citations and quotations omitted).  The question of reasonableness "must be judged from the

perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. (citing *Terry v. Ohio,* 392 U.S. 1, 20-22 (1968)).

Plaintiffs' claims under the Fourth Amendment can be bifurcated into two broad allegations: (1) the PPD's decision to use the SWAT team on the Olivet Road House rendered the search and seizure objectively unreasonable; and (2) the tactics employed by the members of the SWAT team were unreasonable and constituted excessive force.[5]  The Court discusses each in turn.

(1) Use of SWAT Team

Although the Sixth Circuit has not addressed the issue, other appellate courts have reviewed whether the use of tactical assault teams, like SWAT, in seizing a residence and effectuating a search violates the Fourth Amendment's protections.  *See e.g.*, *Jama v. City of Seattle*, No. 10-35822, 2011 WL 3468285 (9th Cir. 2011); *Whitewater v. Goss*, 192 F. App'x 794 (10th Cir. 2006).  Whether the deployment of a SWAT team violates this constitutional provision could arguably arise from the well-established rule "that those who execute lawful search warrants must do so in a reasonable manner."  *United States v. Keszthelyi,* 308 F.3d 557, 569 (6th Cir. 2002) (quoting *Stack v. Killian,* 96 F.3d 159, 162 (6th Cir. 1996)).  An unreasonable show of force during a search and seizure may present constitutional violations sufficient to permit recovery.  *See e.g.*, *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179 (10th Cir. 2001).

---

[5] Throughout the response, Plaintiffs criticize the investigation leading up to the search of the Olivet Road House. They state the PPD should have called the House in advance to see if Dustin was there or sent a small number of detectives to investigate, similar to when Reynolds was questioned.  These complaints cannot form the foundation of a constitutional violation since it is the reasonableness of the seizure, "not the reasonableness of the detectives' conduct in time segments leading up to the seizure" that governs the Fourth Amendment analysis presently before the Court.  *Chappell v. City Of Cleveland*, 585 F.3d 901, 909 (6th Cir. 2009).

Recently, the Third Circuit examined the objective reasonableness of using a SWAT team to storm the residence of a suspected murderer.  *See Walker v. City of Wilmington*, 360 F. App'x 305 (3d Cir. 2010).  There, the police surrounded the plaintiffs' house with a SWAT team and forced entry based on their belief that the murder suspect was hiding within.  *Id.* at 313. Though they were ultimately incorrect, the police's decision to have a "large, armed SWAT team and K-9 Unit present was not unreasonable."  *Id.*  After all, the appeals court recognized the police were "attempting to arrest a murder suspect" and "[m]urder is . . . a very serious crime that makes it objectively reasonable for the police to deem the suspect potentially dangerous." *Id.*  On this basis, the court found that the police's actions comported with the Fourth Amendment's protections.

Much like in *Walker*, use of the SWAT team on November 19 was not unreasonable, and in all likelihood, a prudent decision on the part of the PPD.  Dustin had a documented criminal record and was believed to possess numerous firearms including two assault rifles.  He was also the primary suspect in the execution-style slayings in Hopkins County.  Plaintiffs' contentions that Dustin no longer resided at the Olivet Road House are unavailing.  The statements by Shoulta, along with his driver's license, vehicle's registration, and prior arrest record, all indicated Dustin's primary residence was the Olivet Road House.  Plaintiffs' own expert agrees that there was probable cause to search the premises for both Dustin and evidence on the murders.  McCauley Depo., DN 38-2 at 23-26.  Because it was not objectively unreasonable to believe an armed murder suspect resided within the Olivet Road House, the decision to use the SWAT team was an appropriate reaction to that threat.

(2) Tactics of SWAT team

Plaintiffs argue several of the tactics employed by the SWAT team violated the Fourth Amendment.  Specifically, they contend the following behavior was objectively unreasonable: (1) breaching the door, because it constituted a no-knock entry and there was no evidence Donnie would not have opened it; (2) the use of the flashbang grenade; (3) detaining Donnie and Marcia on the ground and pointing guns at them; and (4) performing the sternum tap on Donnie.

"Officers must wait a 'reasonable period of time' after a knock and announce before physically entering a residence."  *United States v. Pelayo-Landero*, 285 F.3d 491, 498 (6th Cir. 2002) (citing *United States v. Finch,* 998 F.2d 349, 354 (6th Cir. 1993)).  A "reasonable period of time" depends on the situation police officers are faced with before moving into the structure. *Id.* (citation omitted).  The evidence shows the SWAT operators knocked, identified themselves, and waited some period of time before breaching the door.  Plaintiffs do not dispute this series of events; rather, they insist they did not hear the announcement by Robbins and the team.  *See* Donnie Depo., DN 44 at 16; Marcia Depo., DN 46 at 11.  Still, all parties agree that *some* period of time passed between the SWAT operators arriving on the doorstep and knocking, Marcia calling for Donnie to get the door, and Donnie moving from the living room to the foyer.  The weight of the evidence supports this series of events and Plaintiffs' uncertainty does not create an issue of material fact.[6]  Given the possibility of confronting a murder suspect armed with an assault rifle, the momentary pause on the front steps after the police identified themselves was sufficient to satisfy the Fourth Amendment's requirement of objective reasonableness.

Even presuming the SWAT operators entered the Olivet Road House without warning, the circumstances they faced permitted a no-knock entry.  "Forcible entries without

---

[6] Several officers at the scene affirm that they counted either to themselves or out loud after the SWAT operators first knocked and identified themselves.  Although Plaintiffs state they did not hear the initial knock, nor do they claim they kept track of the time from when they first heard the police to the time the door was breached.  In short, there is no evidence to contradict the accuracy of the 15 to 20 second estimation.

announcement of purpose and a refusal of admittance have been approved where: '(1) there would be a danger to the officer; (2) there would be danger of flight or destruction of evidence; (3) a victim or some other person is in peril; or (4) it would be a useless gesture such as when the person within already knew the officer's authority and purpose.'" *Pelayo-Landero*, 285 F.3d at 498 (quoting *United States v. Bates,* 84 F.3d 790, 795 (6th Cir. 1996)).  In *Pelayo-Landero*, the Sixth Circuit upheld the reasonableness of an unannounced, forcible entry where the police knew of at least one firearm in the residence and there could have been a homicide suspect in the home.  *Id.*  Considering Dustin's suspected involvement in the killings and the chance that he possessed several stolen firearms, the Court cannot distinguish the instant matter from *Pelayo-Landero.*[7]

Plaintiffs urge that it was unreasonable for the SWAT team to deploy a flashbang grenade prior to breaking down the door.  This circuit examined the permissibility of such a device in *United States v. Dawkins*, 83 F. App'x 48 (6th Cir. 2003).  There, police officers executed a search warrant on the apartment of a violent felon who was suspected of possessing a variety of firearms, including an assault rifle capable of firing rounds that could penetrate bullet-proof vests.  *Id.* at 49.  Before storming the defendant's apartment, the police deployed a flashbang grenade to neutralize any threats within.  *Id.*  *Dawkins* set forth the appropriate inquiry under the Fourth Amendment: "the reasonableness of the device's use - much like the reasonableness of the officers' wait prior to entry - depends upon the facts and circumstances of each case."  *Id.* at 51. The court then discarded the defendant's arguments against the use of the grenade, stating "where. . . the officers had evidence that a violent felon possessed high-powered weapons, it

---

[7] Inasmuch as Plaintiffs complain that it was unreasonable for the SWAT operators to breach the door when Donnie was on his way to answer it, such contentions cannot form an actionable claim. *Pelayo-Landero* indicates that the officers were not required to wait any amount of time before their forcible entry.  Thus, it is only logical that their decision to force entry when Donnie was at the door was not objectively unreasonable.

would strain credulity to find that the Fourth Amendment's reasonableness requirement precluded the officers from using a device intended to reduce the risks to all parties associated with entry." *Id*. Relying on *Dawkins*, courts within the Western District of Kentucky have dismissed several constitutional violations under § 1983 against officers that have used flashbang grenades to subdue violent suspects. *See e.g.*, *Ramage v. Louisville/Jefferson Cnty. Metro Gov't*, No. 3:08–CV–338–H, 2010 WL 2624128, at *5-6 (W.D. Ky. June 28, 2010) (detonating flashbang grenade outside residence was not unreasonable where the plaintiff had long criminal history and was residing on the premises to be searched); *Graves v. Bowles*, No. 1:07-CV-207-M, 2010 WL 497719, at *8 (W.D. Ky. Feb. 5, 2010) (use of flashbang device outside the vehicle of a bank robbery suspect with a violent criminal history was "unquestionably reasonable").

The facts available to the SWAT team permitted the use of the diversionary device. The PPD reasonably believed an armed murder suspect could have been in the Olivet Road House. Still, the officers exercised their discretion and threw a flashbang grenade outside in the yard. Neither Donnie nor Marcia claim any injuries resulting from the detonation, and the only impact the explosion had on either individual was hearing the blast and being startled by the bright light. Weighing the interest of avoiding such discomfort with "the officers' interest in their own safety based on the criminal history of the suspect, the Court determines that the officers' use of the flashbang outside the home was objectively reasonable." *Ramage*, 2010 WL 2624128, at *6 (citing *Graham,* 490 U.S. at 396).

The complaint contains constitutional violations targeting the SWAT operators' decision to force Plaintiffs to the floor and point their weapons them. Neither of these claims presents a basis for recovery. "An officer's authority to detain incident to a search is categorical; it does not depend on the quantum of proof justifying detention or the extent of the intrusion to be

16

imposed by the seizure." *Muehler v. Mena*, 544 U.S. 93, 98 (2005) (citation and quotations omitted). Where the execution of a warrant may give rise to sudden violence, "[t]he risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation." *Michigan v. Summers*, 452 U.S. 692, 702-03 (1981). Placing Plaintiffs on the ground was not objectively unreasonable. Donnie and Marcia concede the SWAT operators did not use undue force in placing them on the floor. Indeed, Marcia admits that after she alerted the SWAT operators that she had hip problems, they "helped" her to the floor. Plaintiffs were kept on the ground for a matter of minutes while the house was secured, whereupon they were permitted to sit, without handcuffs, at their dining room table while the House was searched. Such behavior did not violate the Fourth Amendment. *See Muehler*, 544 U.S. at 95-100 (detaining occupant for two to three hours in handcuffs during search was reasonable "because the governmental interests outweigh the marginal intrusion").

The same can be said for Plaintiffs' claim that the SWAT team brandished their weapons in an unconstitutional manner. The evidence indicates the team came through the front door and quickly subdued Plaintiffs in the foyer and kitchen. Though the officers' guns were drawn upon entry and were pointed at Plaintiffs for a time, the weapons were holstered after the passage of a few minutes when Plaintiffs were moved to the dining room.[8] Donnie concedes that once the group sat down at the table to discuss the reason for the search warrant, the officers comported themselves in a courteous and professional manner. Donnie Depo., DN 44 at 25. To the extent Plaintiffs were "held at gunpoint," the SWAT operators did not act so unreasonably as to permit this claim to proceed to a jury. *See Ealum*, 46 F. App'x at 591 (police were not entitled to

---

[8] In fact, Donnie admits that while he was on the floor, he was unable to tell if the officers were pointing their weapons at him. Donnie Depo., DN 44 at 8. Marcia indicates that the operators only held a gun on her after she was placed on the floor. Marcia Depo., DN 46 at 13. She testified that she was on the floor for, at most, ten minutes. Marcia Depo., DN 46 at 13.

qualified immunity where they held three minor children, including a six-year-old child at gun point); *Holland*, 268 F.3d at 1192-93 (jury issue if the police violated the Fourth Amendment's reasonableness requirement when they trained weapons on four, eight and fourteen-year-old children).

Finally, Plaintiffs contend Officer Robbins's use of the sternum tap was an unreasonable application of force under the Fourth Amendment. This question is admittedly closer than those previously addressed. Nevertheless, since Plaintiffs cannot show the act was condoned by a municipal policy or procedure, the Court need not examine its constitutionality.

## C. Policy of Municipality

Irrespective of the constitutional violations Plaintiffs must articulate to succeed, they must also identify a municipal policy and connect it to the particular injury they suffered. "There are at least four avenues a plaintiff may take to prove the existence of a municipality's illegal policy or custom. The plaintiff can look to (1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Thomas v. City of Chattanooga,* 398 F.3d 426, 429 (6th Cir. 2005) (internal citations omitted). "Under appropriate circumstances, liability may be imposed upon a municipality for a single decision by a policymaker." *Monistere v. City of Memphis,* 115 F. App'x 845, 851 (6th Cir. 2004) (citing *Pembaur,* 475 U.S. at 480). However, "where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." *Oklahoma City v. Tuttl*e, 471 U.S. 808, 824 (1985).

18

In their response, Plaintiffs make five arguments why the City is liable for an unconstitutional policy.  Considering the lack of information on each, Plaintiffs stand little chance in articulating an unconstitutional custom, practice, or policy sufficient to survive this motion.

First, Plaintiffs stress that the City and PPD condone a policy of forcing entry every time the SWAT team is called into action.  According to Plaintiffs, the automatic choice in favor of dynamic entry absent a totality-of-the-circumstances approach would create a policy sufficient for *Monell* liability.  Though this may be true, the record does not reflect that the SWAT team is engaged in the foreordained practice of forcible entry.  Barnhill has submitted an affidavit indicating that the SWAT team did not forcibly enter eleven residences over the last eight years.  Barnhill Aff., DN 58-5.  Because the SWAT team routinely forgoes forcible entry where the tactic is unnecessary, Plaintiffs have not shown the existence of a policy or custom.  *See Doe v. Claiborne County, Tenn.,* 103 F.3d 495, 507-08 (6th Cir. 1996) ("A 'custom' for purposes of *Monell* liability must 'be so permanent and well settled as to constitute a custom or usage with the force of law.'" (quoting *Monell,* 436 U.S. at 691)).

Second, Plaintiffs attempt to impute liability on the City by claiming Barnhill was the final decision maker on the night of November 19.  Plaintiffs charge that his supervisory role over the SWAT team is sufficient to establish a policy by the City.  Such an assertion is legally implausible.  A municipality may be liable for the unconstitutional actions of an official but he or she must have had the "final authority to establish municipal policy with respect to the action ordered."  *Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993) (quoting *Pembaur,* 475 U.S. at 481).  "Mere authority to exercise discretion while performing particular functions does not make a municipal employee a final policymaker unless the official's decisions are final

and unreviewable and are not constrained by the official policies of superior officials." *Id.* (citing *Praprotnik,* 485 U.S. at 127).  Typically, the final policy maker must derive his authority from "state or local positive law," like "statutes, ordinances, and regulations, and less formal sources of law such as local practice and custom." *Id.* (citations omitted).

Barnhill does not possess unfettered discretion over the SWAT team.  Instead, the members of the PPD must follow the internal policies of the department that govern its use. *See* DN 56 at 3.  Barnhill did not unilaterally decide on the show of force at the Olivet Road House.  Rather, he, along with his supervisors, reviewed the scenario and decided such precautions were necessary for the safety of the police and the occupants of the House.  Such collaboration demonstrates Barnhill is not the final policy maker for the SWAT team.  What is more, neither party has identified a local ordinance or state statute that vests Barnhill with the type of authority necessary to place him at the top of the municipality's managerial pyramid.  For these reasons, Barnhill's behavior does not equate to a municipal policy or custom.

Third, despite Plaintiffs declarations to the contrary, the City did not endorse the SWAT assault on the Olivet Road House.  There is no evidence that the official policy makers of the City acknowledged and acquiesced to any custom regarding the use of the SWAT team. *See Braswell v. Corrections Corp. of Am.*, 419 F. App'x 622, 629-30 (6th Cir. 2011).

Fourth, simply mentioning that the City provided inadequate training to the SWAT team is not enough for Plaintiffs to overcome this motion summary judgment.  "[T]he inadequacy of police training may serve as the basis for § 1983 [municipality] liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris,* 489 U.S. 378, 388 (1989).  The City has submitted documentation of the SWAT team's lengthy training regime.  DN 39-13; DN 39-14; DN 39-15;

DN 39-16.  Plaintiffs' expert agreed that the bimonthly training sessions were sufficient to comply with the nationally recognized best practices for tactical assault squads.  McCauley Depo., DN 38-4 at 9.  Nothing in the record would permit a jury to conclude the SWAT team's training is deficient in any respect.

Finally, even if Robbins's sternum tap was objectively unreasonable, Plaintiffs have not shown the pain compliance technique flowed from a policy or practice of the City.  "'Proof of a single incident of unconstitutional activity is not sufficient to impose liability . . . unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker.'"  *Bekier v. Karnes*, 66 F.3d 325, at *2 (6th Cir. 1995) (table) (quoting *Tuttle*, 471 U.S. at 823-24); *accord Vinson v. Campbell Cnty. Fiscal Court*, 820 F.2d 194, 200 (6th Cir. 1987) ("Proof of a single, isolated incident of misconduct by a 'nonpolicymaking' employee is not sufficient to impose liability under *Monell* unless training or supervision was 'so reckless or grossly negligent' that misconduct was 'almost inevitable' or 'substantially certain to result.'" (quoting *Hays v. Jefferson Cnty.,* 668 F.2d 869, 874 (6th Cir. 1982))).  Plaintiffs have presented no evidence that Robbins's striking Donnie in the chest is an oft repeated maneuver by the PPD's officers.  Nor have they shown the existence of a reckless or unconstitutional policy promulgated by the City or its police force whereby officers routinely use the "sternum tap" as a method to subdue noncompliant citizens.  This absence of evidence prohibits the Court from allowing the claim to continue.

Because Plaintiffs have not shown the existence of constitutional violations or an impermissible municipal policy, summary judgment is warranted.

## D. Separate Claims under Federal Law

The complaint includes claims under 42 U.S.C. § 1985, Article I, and the Due Process Clauses of the Fifth and Fourteenth Amendments.  Plaintiffs have failed to address these legal theories in their response to Defendants' motion to summary judgment.  Considering Plaintiffs' silence and the absence of a factual nexus between the claims and the City's behavior, the Court will dismiss these causes of action.[9]  *See Clark v. Nat'l Travelers Life Ins. Co.*, 518 F.2d 1167, 1169 (6th Cir. 1975) (a district court is not required to construct a claim for a litigant).

**E. State Law Claims**

The Defendants have been granted summary judgment as to all federal claims asserted in this matter by Plaintiffs.  The only remaining theories against the City are the state-law torts of assault, battery, negligence, and gross negligence.  As such, the Court finds that it does not have pendent jurisdiction under 28 U.S.C. § 1367 to address the remaining state law claims asserted against the Defendants. *See* 28 U.S.C. § 1367(c)(3) ("[t]he district courts may decline to exercise supplemental jurisdiction over a claim under subsection . . . if . . . the district court has dismissed all claims over which it has original jurisdiction"); *Taylor v. First of Am. Bank-Wayne*, 973 F.2d 1284, 1287-88 (6th Cir. 1992) (holding that "if the federal claims are dismissed before trial . . . the state claims should be dismissed as well."); *Hankins v. The Gap, Inc.*, 84 F.3d 797, 802-03 (6th Cir. 1996).  Accordingly, the Court declines to exercise jurisdiction as to the remaining state-law claims asserted, and therefore, they are dismissed without prejudice**.**

**IV. CONCLUSION**

The Court is not unsympathetic to Plaintiffs' position.  Through no fault of their own, they were placed in the middle of what was undoubtedly a frightening encounter with a part of

---

[9] Belatedly, Plaintiffs assert that the City may be liable for a due process violation under the state-created-danger theory.  As such a claim is only cognizable against a state actor where a *private individual* causes an injury, the exception to the Due Process Clause does not apply to these facts. *Willis v. Charter Tp. of Emmett*, 360 F. App'x 596, 601 (6th Cir. 2010).

law enforcement that, thankfully, goes unseen by most members of society.  At times however, tactical assault teams are a vital component of law enforcement's arsenal, especially when confronting violent and dangerous individuals.  The facts available to the PPD on November 19, 2009, justified all available precautions.  Indeed, if it is objectively unreasonable to use the SWAT team to effectuate search and arrest warrants on an armed murder suspect's legal residence, the Court struggles to conceive of a scenario where such a show of force would ever be condoned.  Plaintiffs' constitutional rights were not violated and summary judgment in favor of the City is appropriate.

FOR THESE REASONS, Defendants' motion for summary judgment (DN 39) is GRANTED IN PART.  All federal-law causes of action are hereby DISMISSED with prejudice. The remaining state-law claims are DISMISSED without prejudice.  The clerk of court is directed to strike this matter from the active docket.  An appropriate order shall issue.